## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue<br>Tucson, AZ 85701,<br><br>       Plaintiff,<br><br>  v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street N.W.<br>Washington, D.C. 20240,<br><br>MARTHA WILLIAMS, in her official capacity<br>as Director of the U.S. Fish and Wildlife<br>Service,<br>1849 C Street N.W.<br>Washington, D.C. 20240,<br><br>      and<br><br>DEB HAALAND, in her official capacity as<br>Secretary of the U.S. Department of the<br>Interior,<br>1849 C Street N.W.<br>Washington, D.C. 20240,<br><br>      Defendants. | Civil Action No.: 1:24-cv-691<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Plaintiff Center for Biological Diversity ("Center") challenges Defendant U.S. Fish and Wildlife Service's ("Service") unlawful decision to deny Endangered Species Act ("ESA") protections to the Arkansas mudalia (*Leptoxis arkansensis*). 84 Fed. Reg. 13237 (Apr. 4, 2019) ("not-warranted finding"). The Service's failure to list the Arkansas mudalia violated its mandatory duties under the ESA, 16 U.S.C. §1533, and deprives the species of the critical protections necessary to ensure its continued survival and recovery.

2.      The Arkansas mudalia is a critically imperiled freshwater snail found in a small number of sites in Arkansas and Missouri. The species' range has shrunk dramatically because of dam construction and human land use activities. It has been extirpated from 90% of its historic range and remaining populations face a myriad of ongoing and worsening threats to their survival, including climate change-driven impacts to its habitat suitability.

3.      In response to the Arkansas mudalia's decline and lack of protection, the Center petitioned the Service to list the Arkansas mudalia as an endangered or threatened species under the ESA in 2010. On September 27, 2011, the Service concluded that the petition presented substantial information indicating that the Arkansas mudalia may warrant listing.

4.      Yet, despite its own science showing that the Arkansas mudalia has experienced substantial population decline and is left with dwindling suitable habitat and isolated populations, on April 4, 2019, the Service denied the species ESA protections. 84 Fed. Reg. 13237. #

5.      The Service's finding failed to rationally address the increasing density of cattle, the possibility of additional dam construction, climate change-driven drought and storms, and ongoing logging and mining in the Arkansas mudalia's remaining range—all of which are expected to negatively impact the species' future viability. The finding is thus arbitrary and capricious and in violation of the ESA.

6.      The Service also produced a flawed analysis to determine whether the species is threatened or endangered in a *significant portion of its range*—an independent basis for listing that the Service is required to analyze. The Service both misapplied the standards of the ESA and disregarded the threats to the species that are concentrated on private lands.

7.      In finding that the Arkansas mudalia is not in danger of extinction throughout *all of its range*, the Service based its decision on the presence of a small number of populations on National Forest public lands where the U.S. Forest Service restricts land use activities and applies Best Management Practices ("BMPs"). In doing so, the Service failed to explain how the BMPs will benefit the species and ignored substantial threats on private lands where most populations are found. Additionally, the Service arbitrarily characterized remaining populations with as few as 50 individuals as "high abundance" populations.

8.      For these and additional reasons, the Service's not-warranted finding for the Arkansas mudalia fails to follow the best available science, violates the ESA, and is arbitrary and capricious. To remedy these violations, the Center seeks an order vacating the Service's not-warranted finding and remanding the matter to the Service to issue a new finding as to whether the Arkansas mudalia warrants protection under the ESA as an endangered or threatened species by a date certain.

## JURISDICTION AND VENUE

9.      The Center brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. §1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. §702, which waive Defendants' sovereign immunity.

10.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201–2202 (declaratory judgments and further relief); 16 U.S.C. §1540(c) (district court jurisdiction); 16 U.S.C. § 1540(g)(1)(C) (action arising under the ESA citizen-suit provision); and 5 U.S.C. §§702–704 (APA).

11.      Venue is proper in the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against an agency of the United States and

officers and employees of the United States acting in their official capacities and under the color

of legal authority, and because no real property is involved in this action. The Center also

maintains an office in this judicial district.

12.     Pursuant to the ESA citizen suit provision, the Center provided the Secretary of

the U.S. Department of the Interior and the Director of the Service with 60 days' notice of intent

to sue for ESA violations on December 29, 2023, more than 60 days prior to the filing of this

complaint.

## PARTIES

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national non-profit

conservation organization with more than 79,000 members, including many who live and

recreate in the Arkansas mudalia's range. The Center works through science, law, and creative

media to secure a future for all species, great and small, hovering on the brink of extinction, with

a focus on protecting the lands, waters, and climate that species need to survive. The Center is

headquartered in Tucson, Arizona, with offices throughout the United States.

14.     The Center brings this action on behalf its members who maintain professional,

scientific, recreational, aesthetic, economic, spiritual, and other legally protected interests in the

Arkansas mudalia and its habitat. The Center's members live near and/or regularly visit areas

where the Arkansas mudalia is known or believed to exist, in hopes of viewing this increasingly

rare species.

15.     For example, Center member and freshwater biologist Will Harlan, who resides in

North Carolina, travels regularly to the Arkansas mudalia's habitat and has done so since he was

a child. He visits the area both for his work as a biologist and because he has a personal interest

in the area and in observing and enjoying its biodiversity, including the Arkansas mudalia. In Mr.

Harlan's view, the Ozarks and the White River are some of the most unique biodiversity hotspots in the world. Mr. Harlan has plans to visit Arkansas mudalia habitat, including the North Fork White River, in the summer of 2024 to enjoy recreational activities, and plans to bring his children there to show them the unique wildlife it contains, including the Arkansas mudalia. Mr. Harlan intends to continue to visit the species' habitat on a regular basis in the future.

16.     The Service's decision to deny ESA protections to the Arkansas mudalia has caused the Center's members, including Mr. Harlan, to suffer a concrete and particularized injury that is actual and imminent. Without the protections provided by listing the Arkansas mudalia as an endangered or threatened species pursuant to the ESA, the species is likely to continue down a path towards extinction, and the Center's members, including Mr. Harlan, will continue to suffer injury unless the relief sought in this complaint is granted.

17.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for non-marine species. 50 C.F.R. § 402.01(b). This authority encompasses findings and proposed and final listing determinations for the Arkansas mudalia.

18.     Defendant MARTHA WILLIAMS is the Director of the U.S. Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. Plaintiff sues Defendant Williams in her official capacity.

19.     Defendant DEB HAALAND is the Secretary of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA regarding the Arkansas mudalia, and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiff sues Defendant Haaland in her official capacity. #
#

## STATUTORY AND REGULATORY BACKGROUND

### The Endangered Species Act

20.     Congress passed the ESA to "provide a program for the conservation of …
endangered species and threatened species" and "to provide a means whereby ecosystems upon
which endangered species and threatened species depend may be conserved." 16 U.S.C. §
1531(b). The plain intent of Congress in enacting the ESA "was to halt and reverse the trend
toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184
(1978).

21.     The ESA requires that "all Federal departments and agencies… seek to conserve
endangered species and threatened species and…utilize their authorities in furtherance of the
purposes" of the ESA. 16 U.S.C. § 1531(c)(1).

22.     Species are afforded protection under the ESA only if the Service lists them as
threatened or endangered. A species is "endangered" if it "is in danger of extinction throughout
all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" if it "is likely to
become an endangered species within the foreseeable future throughout all or a significant
portion of its range." *Id.* § 1532(20).

23.     The Service must determine whether any species is endangered or threatened
because of any of the following factors: (A) the present or threatened destruction, modification,
or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific,
or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory
mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* §
1533(a)(1).

6

24.     If a species meets the definition of threatened or endangered because it is imperiled by any one or a combination of these five factors, the Secretary must list the species. *Id.*; 50 C.F.R. § 424.11(c). The Secretary must base all listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

25.     If the Service concludes that a species is endangered or threatened throughout all of its range, the Service must publish a proposed rule to list the species in the Federal Register. *Id.* § 1533(b)(5).

26.     If the Service determines that the species is neither endangered nor threatened throughout all of its range, the ESA then requires the agency to examine whether it is endangered or threatened throughout any *significant portion* of that range. And if the Service determines that the species is threatened but not endangered throughout all of its range, it must still examine whether the species is *endangered* in any significant portion of its range. *Id.* § 1532(6).

27.     The ESA does not define what constitutes a "significant portion" of a species' range. In 2014, the Service promulgated a "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the ESA's Definitions of 'Endangered Species' and 'Threatened Species'" 79 Fed. Reg. 37578 (July 1, 2014) ("SPR policy").

28.     The SPR policy directs the Service to determine whether: (1) the portions may be significant; and (2) the species may be in danger of extinction in those portions or likely to become so in the foreseeable future. *Id.* at 37586. The Service may answer these questions in any order, and if both questions are answered in the affirmative, the agency must list the species as endangered or threatened. If either question is answered in the negative, however, that is the end of the inquiry. The SPR policy directs the Service to consider whether any threats facing the species are geographically concentrated. *Id.*

29.     The ESA's mandate that the Service rely on the "best scientific and commercial data *available*," 16 U.S.C. § 1533(b)(1)(A) (emphasis added), means the Service must act based on the science available to the agency and cannot dismiss threats to or refuse to list a species based on uncertainty alone. Congress's intent in allowing the Service to list a species based on the best scientific data available rather than requiring scientific certainty was for the Service to act and provide ESA protections to imperiled species before they stood on the brink of extinction and beyond any likely hope of recovery. *See* H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973) ("In the past, little action was taken until the situation became critical and the species was dangerously close to total extinction. This legislation provides us with the means of preventative action.") (remarks of Rep. Clausen); *Id.* ("By heeding the warnings of possible extinction today, we will prevent tomorrow's crisis.") (remarks of Rep. Gilman)).

30.     Any person may petition the Service to list a species under the ESA. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). After receiving a petition to list a species as threatened or endangered, the Service has 90 days to "make a finding as to whether the petition presents substantial scientific or commercial information indicating that" listing may be warranted. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h). This determination is known as a "90-day finding."

31.     If the Service makes a positive 90-day finding in response to a petition, it must publish that finding in the Federal Register and proceed with a scientific review of the species' status, known as a "status review." 16 U.S.C. § 1533(b)(3)(A).

32.     Following completion of the status review, and within 12 months of receiving the petition, the Service must publish one of three findings: (1) listing is "warranted," (2) listing is

"not warranted," or (3) listing is "warranted but precluded" by other pending proposals to list species, provided certain circumstances are met. *Id.* § 1533(b)(3)(B).

33.     If the Service issues a finding that listing the species is "warranted," it must publish a proposed rule to list the species as endangered or threatened in the Federal Register. *Id.* § 1533(b)(5). Within one year of publishing a proposed rule to list a species, the Service must, with limited exceptions, issue a final rule listing the species and designating critical habitat for it. *Id.* § 1533(a)(3), (b)(6)(A), (C).

34.     If the Service issues a finding that listing the species is "not warranted," that finding is a final agency action subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

35.     A species receives the numerous substantive protections of the ESA only after it is listed as an endangered or threatened species. For example, Section 7 of the ESA requires that all federal agencies ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a listed species critical habitat. *Id.* § 1536(a)(2). Section 9 of the ESA prohibits, among other things, "any person" from intentionally or incidentally "taking" listed species without a lawful authorization from the Service. *Id.* §§ 1538(a)(1)(B), 1539. Other provisions require the Service to designate "critical habitat" for listed species, *id.* § 1533(a)(3), and "develop and implement" recovery plans for listed species, *id.* § 1533 (f), and authorize the Service to make federal funds available to states to assist their efforts to preserve and protect threatened and endangered species, *id.* § 1535(d).

**The Administrative Procedure Act**

36.     Under the APA's standard of review, a court must hold unlawful and set aside "agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). This standard of review applies to claims brought under the citizen suit provision of the ESA.

37.     An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

## **FACTUAL BACKGROUND**

### **The Arkansas Mudalia and Threats to Its Continued Existence**

38.     The Arkansas mudalia is a small freshwater snail species found in a few medium-to-large rivers in Arkansas and Missouri. The species is a freshwater gastropod belonging to the family Pleuroceridae, which play a crucial role in the health of freshwater ecosystems. Pleurocerids like the Arkansas mudalia have an alarmingly high imperilment rate of 79%, with many species in the family under threat of imminent extinction because of widespread human alteration of rivers. Once found throughout the White River and North Fork White River watersheds, the Arkansas mudalia's range has been reduced to a handful of locations in only the latter watershed.

39.     The Arkansas mudalia's preferred habitat consists of river channels with fast currents and coarse boulder and cobble substrates. These substrates provide cover and egg-laying surfaces, and are home to the microscopic organisms known as periphyton that the snails eat. The species lives for only two years and reproduces only once per generation.

40.     Aquatic snails like the Arkansas mudalia are significantly restricted in their dispersal capabilities. They move upstream at a naturally slow pace, resulting in total yearly

movement of only roughly 1km. The maximum distance at which populations can mix is about 3km.  Disturbances and barriers within their range such as dams isolate populations, increasing risk of genetic problems and population loss.

41.     The Arkansas mudalia is threatened by a multitude of factors. These include pollution and habitat degradation caused by dams, diversions, mining, logging, and livestock grazing. The species' range has been reduced by nearly 90% and six of nineteen known sites have been extirpated. Remaining populations are experiencing isolation, habitat alteration, and low abundance as human activity and a changing climate continue to further limit suitable habitat.

**The Species Status Assessment**

42.     In response to the various threats to the Arkansas mudalia's continued existence, on April 20, 2010, the Center petitioned the Service to list the species as endangered or threatened under the ESA. On September 27, 2011, the Service published a 90-day finding determining that the petition presented substantial information indicating that the Arkansas mudalia may warrant listing. 76 Fed. Reg. 59836 (Sept. 27, 2011).

43.     In 2018, the Service completed a Species Status Assessment ("SSA") for the Arkansas mudalia. An SSA, as described by the Service, is a compilation of the best available science regarding a particular species, but does not result in a recommendation as to whether the species warrants listing as threatened or endangered.

44.     The SSA evaluates the species' current population status and future viability in the context of its biology and threats to its survival. The Service defines "viability" as the species' ability to sustain populations in the wild over time.

45.     The Service assessed the Arkansas mudalia's current condition by collecting data on approximate abundance, habitat alteration, presence of protected land, and isolation for each of the nineteen sites with known Arkansas mudalia populations. Considering each of these factors together, the SSA provides a "total" condition rating of "low," "medium," or "high."

46.     The Service defines "high abundance" as populations where recent surveys (2000-present) found >50 individuals, "medium abundance" as populations where recent or historical (1946-2000) found <50 individuals, and "low abundance" as populations where historical surveys found <50 individuals. The SSA does not provide any explanation or rationale for how the Service developed these threshold definitions of abundance.

47.      Of the thirteen remaining populations, the SSA states that five have low abundance, six have medium abundance, and only two remaining populations have high abundance.

48.     One of these two populations (Site 13) is located on Spring Creek within the Mark Twain National Forest, and although its physical condition is described as "low," the SSA characterizes its "land protection" and "total" current condition as "high."

49.     Another remaining population (Site 11) on the North Fork White River within the Mark Twain National Forest has maintained mudalia for 70 years, but only has "medium" abundance (<50 individuals and a total current condition of "medium."

50.     The Spring Creek population is the sole remaining population to have a high total condition rating, while six additional populations are given a "medium" rating. The other "high abundance" population (Site 16) is located on private land within the North Fork White River watershed, and the SSA characterizes its total current condition as "low."

12

51.     The SSA predicted future conditions for the Arkansas mudalia by analyzing anticipated changes to known stressors, including ongoing dam operation, mining, logging, livestock grazing, and climate change.

52.     Having already lost most of its range to the construction and operation of dams and reservoirs, the SSA's analysis of the snail's future condition found that existing dams will continue to isolate remaining populations, alter sedimentation, and increase exposure of remaining snails to predatory fish.

53.     The SSA also predicted that various anthropogenic land uses will continue to degrade the Arkansas mudalia's habitat. The Service found that the watershed containing most of the remaining Arkansas mudalia populations includes a significant amount of pasture and rangeland and is one of the main cattle-producing areas for the State of Missouri. Cattle access to streams causes nonpoint source pollution, soil compaction, reduced riparian vegetation, increased in-stream disturbance, and bank erosion—all of which deteriorate habitat suitability. According to the SSA, the density of cattle in the North Fork White River Watershed is expected to increase and many private landowners are unwilling to implement voluntary BMPs to mitigate the impact of cattle.

54.     The Service also identified a myriad of climate-change related impacts that threaten the Arkansas mudalia's survival and are likely to have synergistic effects when combined with other stressors, such as water pollution, invasive species, and hydrologic changes.

55.     The Service expects climate change to cause increased air and water temperatures, which will restrict the Arkansas mudalia's habitat and alter stream flows. Increasingly severe droughts and storms will put additional stress on remaining populations.

56.     The Service also found that greater water withdrawals for human use and the possibility of additional dam construction in response to unpredictable rainfall will likely worsen the impacts of climate change on the species' habitat.

57.     The Service's future conditions analysis concludes that "any change to a population's habitat that causes lowered recruitment failure could extirpate that population."

58.     Ultimately, the SSA finds that the Arkansas mudalia "is not highly resilient" and notes that remaining populations could experience drastic population loss or extirpation when affected by an event that reduces reproduction for just two years.

## The Species Assessment and Not-Warranted Finding

59.     Subsequent to the SSA, the Service then prepared a Species Assessment and Listing Priority Assignment Form ("SAF") for the Arkansas mudalia. The SAF purportedly summarizes the science contained in the SSA and concludes with the Service's finding that the Arkansas mudalia does not warrant listing as a threatened or endangered species, asserting that climate change, land use changes and resulting water quality impacts, stressors from existing dams, and other impacts discussed in the SSA do not put the species at risk for extinction.

60.     In the SAF, the Service first concluded that the Arkansas mudalia is not in danger of extinction, or likely to become so, throughout *all of its range*. It then concluded that the threats facing the species are not concentrated in a portion of the species' range, and therefore the Arkansas mudalia is also not in danger of extinction in any *significant portion of its range*.

61.     On April 4, 2019, the Service then published its determination that listing the Arkansas mudalia as threatened or endangered under the ESA was "not warranted." 84 Fed. Reg. 13237. As support for its determination, the Service reiterated the conclusions made in the SAF

14

and the finding that stressors to the Arkansas mudalia do not rise to a level that would afford it protection under the ESA.

62.    On December 21, 2023, the Center sent Defendants a letter containing 60 days' notice of intent to file suit, as required by the ESA. On February 2, 2024, the Service responded saying that it intends to review the species' status and add it to the National Listing Workplan for FY28. However, in the absence of judicial relief there is no assurance that the Service will do so.

## FIRST CLAIM FOR RELIEF

### Violation of the ESA and APA

*The Service Unlawfully Determined that Listing of the Arkansas Mudalia as an Endangered or Threatened Species Is Not Warranted*

63.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

64.    The Service "shall … determine whether any species is an endangered species or a threatened species" because of any one or a combination of the ESA's five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

65.    A reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

66.    The Service's not-warranted finding and associated SAF is based on a string of unsupported conclusions that the various threats to the Arkansas mudalia detailed in the SSA,

and affirmed by the best available scientific information, are not likely to affect the species' future viability.

67. For example, the Service found that dams "are not significantly affecting the remaining current populations" and that there is "no data to show that these stressors will increase significantly into the foreseeable future." SAF at 14. This conclusion is contradicted by the Service's own SSA, which states that "existing dams will continue to isolate remaining populations, increase sediment and gravel deposition upstream of reservoirs, and increase exposure of any remaining snails to predatory fish." SSA at 15. The Service's finding also ignores the possibility of additional dam construction as a human response to unpredictable rainfall caused by climate change. The SSA explicitly notes this possibility, yet the risks of future dam construction to the Arkansas mudalia factor nowhere in the Service's analysis of whether to list the species as threatened or endangered.

68. The Service found that climate change is unlikely to affect future viability of the Arkansas mudalia because its habitat is medium-to-large rivers. SAF at 15. The Service did not provide a basis for its conclusion that medium-to-large rivers are impervious to the effects of climate change. In direct contradiction to its finding, the SSA states that climate change will cause droughts and unpredictable rainfall, both of which pose risks to viability of remaining Arkansas mudalia populations.

69. The Service also summarily concluded that increased drought and storm intensity are "not likely to significantly affect the viability of the species," and that land use changes and resulting water quality impacts "are not expected to have significant impacts to the species within the foreseeable future," but provides no evidence supporting these conclusions. SAF at 15.

70.     Similarly, the Service failed to explain how its finding is consistent with the continued cattle grazing, mining, logging, and predation within the Arkansas mudalia's remaining range, as detailed in the SSA and affirmed by the best available scientific information regarding the species' threats.

71.     Moreover, the Service's finding failed to address the significant impact that loss of range, populations, and suitable habitat has had on the species, leading to decreases in genetic diversity and a weakened ability for the species to survive stochastic and catastrophic events.

72.     These failures are compounded by the Service's lack of explanation or rationale for its thresholds defining some of remaining extant populations as maintaining "medium" or "high" abundance. The Service's arbitrary definition of populations that have only 50 individuals as "high abundance" and populations with fewer than 50 individuals as "medium abundance" has no basis in the best available science.

73.     The Service also found that the viability of the four Arkansas mudalia populations on National Forest land are secure because of restrictions on land use activities and use of Best Management Practices. The SAF did not detail what these BMPs consist of, examine whether the BMPs are adhered to, or address how BMPs protect populations from threats like climate change, existing or new dams, low abundance, or isolation.

74.     Given the Arkansas mudalia's dire status, shrinking range, and ongoing threats to its survival documented in the SSA and affirmed by the best available science, the Service's failure to provide a rational explanation for why these threats facing the species do not warrant its listing as endangered or threatened violates the ESA and is arbitrary and capricious. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of the ESA and APA

#### *The Service's Significant Portion of its Range Analysis is Arbitrary and Capricious*

75.     The Center realleges and incorporates by reference the preceding paragraphs.

76.     A species is "endangered" if it is "in danger of extinction" in "*a significant portion of its range,*" and "threatened" if it "is likely to become an endangered species within the foreseeable future" in "*a significant portion of its range.*" 16 U.S.C. § 1532(60), (20) (emphasis added).

77.     The Service found that the Arkansas mudalia is not endangered or threatened in a significant portion of its range because the agency found "no concentration of threats in any portion of the Arkansas mudalia's range at a biologically meaningful scale." SAF at 16.

78.     The first flaw in the Service's approach to this analysis is that nothing in the ESA requires that threats be concentrated for a species to be threatened or endangered in a significant portion of its range. The statutory standard the Service is required to apply in making its determination calls for analysis of the species' conservation status; that is, whether the Arkansas mudalia is *endangered or threatened* in a significant portion of its range. 16 U.S.C. § 1532(6), (20) (emphasis added). By looking solely at threats independent of extinction risk, the Service can ignore the various factors detailed in the SSA that contribute to a species' likelihood of extinction, such as population isolation and low abundance.

79.     The second error is that the Service's conclusion that there is no "concentration of threats" disregards both the best available science and the agency's own findings that multiple threats to the Arkansas mudalia are, in fact, geographically concentrated within its range.

80.     For instance, the Service failed to analyze the threats the species faces on private lands, where most populations are found. The Service failed to explain how the many threats to

18

the species on private land does not constitute a significant portion of the Arkansas mudalia's range where threats are concentrated. In contrast to the populations on public land, populations on private land do not benefit from protections such as mandatory BMPs or restriction on land use activities, so threats from land use activities are indeed concentrated in the portion of the species range on private land. SSA at 17; SAF at 15. As noted in the SSA, certain land use activities occur throughout the Arkansas mudalia's range, but only the populations on public land are arguably protected by the mandatory use of BMPs or restrictions on land use practices. On private land, landowners are "unwilling to follow BMPs and maintain associated structures[,]" SSA at 17, leaving these populations without the protection that the Service alleges will ensure the species' survival. Of the six sites whose populations have been extirpated, all occur outside National Forest land, suggesting that populations outside public land are particularly at risk. Additionally, all six of the sites with extant populations that the Service ranked as being in "low" current condition in its SSA are outside National Forest land. Therefore, the threats the species faces from habitat loss associated with land use activities are concentrated on the portion of its range on private land.

81.     This analysis violates the ESA because it misapplies the "significant portion of its range" standard and because threats to the Arkansas mudalia are, in fact, concentrated in the significant portions of its range on private lands where BMPs are not mandatory and the species faces a concentration of threats from land use activities.

82.     The Service's finding that the Arkansas mudalia is not threatened or endangered in a significant portion of its range despite these concentrated threats violates and misapplies the ESA, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court:

(1)     Declare unlawful, set aside, and vacate Defendants' not-warranted finding;

(2)     Remand the not-warranted finding to Defendants and order the Service to issue a new listing determination by a date certain that is consistent with the ESA, APA, and this Court's Order;

(3)     Award Plaintiff reasonable attorneys' fees, costs, and expenses; and

(4)     Grant Plaintiff such further and additional relief as the Court may deem just and proper.

DATE: March 11, 2024

Respectfully submitted,

*/s/Brian Segee*
Brian Segee (D.C. Bar No. 492098)
CENTER FOR BIOLOGICAL DIVERSITY
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: (805) 750-8852
bsegee@biologicaldiversity.org

*/s/Trisha Sharma*
Trisha Sharma (*pro hac vice application pending*)
(OR Bar No. 235094)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Phone: (507) 990-2617
tsharma@biologicaldiversity.org

*Attorneys for Plaintiff*

20